## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEBRASKA

SHAWNA MOORE,

                Plaintiff,

vs.

CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,

                Defendant.

4:12-CV-3132

MEMORANDUM AND ORDER

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Shawna Moore's claim for disability insurance benefits under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* The Court has considered the parties' filings and the administrative record, and the Commissioner's decision will be remanded for proceedings consistent with this memorandum and order.

### PROCEDURAL BACKGROUND

This case involves two applications made under the SSA. In February 2010, Moore applied for disability insurance benefits under Title II and for supplemental security income benefits under Title XVI. T38–39; T313–14. Both claims were denied initially and on reconsideration. T40–49. Following a hearing on May 4, 2011, the administrative law judge (ALJ) found that Moore was not disabled as defined under 42 U.S.C. §§ 416(i), 423(d), or 1382c(a)(3)(A), and therefore not entitled to benefits under the SSA. T26–37.

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4). At step one, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. *Id.*; *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). If the claimant has engaged in substantial gainful activity, she will be found not to be disabled; otherwise, at step two, she has the burden to prove she has a medically determinable physical or mental impairment or combination of impairments that significantly limits her physical or mental ability to perform basic work activities. *Gonzales*, 465 F.3d at 894. At step three, if the claimant shows that

her impairment meets or equals a presumptively disabling impairment listed in the regulations, she is automatically found disabled and is entitled to benefits. *Id.* Otherwise, the analysis proceeds to step four, but first, the ALJ must determine the claimant's residual functional capacity (RFC), which is used at steps four and five. § 404.1520(a)(4). At step four, the claimant has the burden to prove she lacks the RFC to perform her past relevant work. *Gonzales*, 465 F.3d at 894. If the claimant can still do her past relevant work, she will be found not to be disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*

Moore has alleged that she has been disabled since December 31, 2009, primarily as a result of several mental impairments: an anxiety-related disorder and/or posttraumatic stress disorder (PTSD) with panic attacks; affective (mood) disorders, including bipolar affective disorder and major depression; attention deficit disorder; and mild mental retardation.[1] T28, 33, 38–39, 44, 84, 149, 310, 313–14. At the time of the administrative hearing in May 2011, Moore was 36 years old. T325.

In this case, at step one, the ALJ found that Moore had not engaged in substantial gainful activity since her alleged disability onset date of December 31, 2009. T28. At step two, the ALJ found that Moore had the following severe impairments: bipolar affective disorder, attention deficit disorder, PTSD, and borderline intellectual functioning.[2] T28. Next, at step three, the ALJ found that Moore's impairments, considered singly and in combination, did not meet or medically equal a presumptively disabling listed impairment. T29–31.

The ALJ found that Moore had the RFC to perform a full range of work at all physical exertional levels, with several non-exertional (mental) limitations: Moore was limited to simple, routine, and repetitive tasks in a low stress environment, defined as requiring only occasional decision-making

---

[1] SSA regulations and the parties in this case use the term "mental retardation." However, because that term can be inaccurate and is offensive to many persons, the SSA is transitioning to using the term "intellectual disability" to refer to the same concept. *Talavera v. Astrue*, 697 F.3d 145, 148 n.2 (2d Cir. 2012) (quoting *Proposed Rules: Revised Medical Criteria for Evaluating Mental Disorders*, 75 Fed. Reg. 51336–01, 51339 (Aug. 19, 2010)). At times, this Court will use the phrase "mental retardation," because that is the language used by the parties and in the medical records.

[2] At step two, the ALJ also found that Moore suffered from asthma, and that it was a severe impairment. T28. The ALJ accounted for Moore's asthma by including additional limitations in Moore's RFC. T28, 32. However, Moore's appeal focuses on her mental conditions, and the Court will not discuss her asthma further.

and occasional changes in the work setting. Additionally, Moore required work with no interaction with the public and no more than occasional contact with coworkers. T31.

At step four, the ALJ found that Moore was unable to perform her past relevant work. T36. And at step five, the ALJ found that Moore could perform jobs that existed in significant numbers in the national economy, based on the testimony of a vocational expert. T36–37. The ALJ provided representative jobs of dishwasher, warehouse worker, and hand packager. T37. So, the ALJ found that Moore was not disabled. T37.

On May 25, 2012, after reviewing additional evidence provided by Moore, the Appeals Council of the Social Security Administration denied Moore's request for review. T1–4. Moore's complaint (filing 1) seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g). *See also* § 1383(c)(3).

## FACTUAL BACKGROUND

Moore suffers from a number of mental conditions. The administrative record contains extensive documentation of Moore's reports concerning her symptoms, her visits to treatment providers, and their evaluations and treatment notes. The Court has fully reviewed that record, but only the particularly relevant portions will be summarized below.

### I. Pre-Onset Date Medical and Work History

Before kindergarten, Moore underwent a psychological evaluation, which found that she fell into the "educable mentally retarded range of intelligence." T296. As a result, she was placed in a developmental kindergarten program, and throughout her education, Moore was enrolled in some special education classes. T181, 192, 288, 295–96. In 1987, when she was 12, Moore underwent an IQ test, and received a full-scale score of 72. T293. This placed her within the limits of "borderline intelligence" and the evaluator stated that Moore met the criteria of "mild educable mental retardation." T293–94. The evaluator noted, however, that Moore tended to give up easily and that Moore may have been more capable than she appeared. T293–94. For example, Moore was able to complete some math questions that she skipped over when given the same questions after the test was over. T293. The evaluator also found that developmentally, Moore was functioning at a high 6-year-old level. T294. Eventually, Moore dropped out of school after completing the ninth grade. T114, 181, 191, 326–27.

Moore has had a tragic and tumultuous family life. As a child, Moore was abused—sexually, physically, and emotionally—by her father. T187, 282–83. She moved out of her parents' house when she was 16 and married

quickly. T187. Her first husband was also physically and emotionally abusive, and they divorced after 9 years. T187, 191, 282. Moore's first marriage produced two children, who were ages 17 and 18 at the time of the hearing in May 2011. T187, 191, 339. Throughout the relevant time period, those children lived with their father or his parents. T191, 283, 339. At one point Moore reported that she had "very little to no contact" with her children because their father did not allow it. T191. But at the hearing before the ALJ, she stated that she could see them whenever she wanted to go see them, although she usually called. T339. In 2001, Moore married her second husband. T283. This relationship, fortunately, was not abusive. T187, 282. As a result of her second marriage, Moore gained four step-grandchildren, who were ages 3, 4, 7, and 9 at the time of the hearing. T334.

Although the record contains no medical notes prior to Moore's alleged disability onset date of late 2009, there is evidence that anxiety and depression have troubled Moore for many years. T266. In 2000, Moore was hospitalized following a suicide attempt. T181, 192, 281–82. She was also reportedly diagnosed with PTSD around that time. T282. Some years later, her father, who had been incarcerated for his sexual abuse of Moore, was released from prison. Moore later reported that she became more anxious following his release and more reluctant to go out in public. T191–92. And for years prior to her alleged disability onset date, Moore was troubled by nightmares of abuse by her father. T266.

Since 1995, Moore has worked in a number of jobs. From 1995 to 2009, she worked for various employers as a cashier, short-order cook, and waitress. T115. Some of these were full-time positions. T115, 328–330. For some significant period of time, she also worked as a cashier for one or more retail stores for 25-30 hours a week. T115, 329. Most recently, Moore worked for about 6 months as a waitress, until December 31, 2009, when she was fired. Moore later explained that she was fired because she missed work a lot, was having panic attacks, and "couldn't keep up with what they wanted." T130, 238, 328.

## II. Medical and Disability Records

On March 2, 2010, Moore met with Y.Z. Leonard, APRN, for a psychiatric evaluation. T181. Moore reported worsening depression over the past few months and complained of severe insomnia. She was still having nightmares of being abused by her father, and was sleeping an average of only 2 to 3 hours a day. Moore complained of being exhausted and experiencing a lack of concentration, focus, and motivation; feeling hopeless and helpless; and experiencing social isolation. T181. She rated her depression as a 10 out of 10 but denied suicidal ideation, and she was

irritable and had anger problems. T181. In a mental status examination, Leonard found that Moore's memory and cognitive functioning were within the "wide range of normal." T182. However, Leonard found that Moore's attention span and concentration were "severely impaired." Leonard diagnosed Moore with major depressive disorder, recurrent, severe and assigned a Global Assessment of Functioning (GAF) score of 50.[3] T182.

Moore described her symptoms in several "disability reports" from March and April 2010. She was still having trouble sleeping due to her nightmares and would take an hour-long nap every other day. T138. Moore reported experiencing "anxiety reactions" or panic attacks, which she described as feeling that someone was "going to get [her]. And I feel [like] my chest is going to have a heart attack." T138–39; *see also* T116, 130. Moore stated that these happened every day and lasted from 30 minutes to 2 hours. Moore reported that being alone, driving, and being at work made her anxious, and that being around a lot of people made her condition worse. Calling her husband or her aunt, or being with her husband, helped her to calm down. T139.

Moore described her activities of daily living in the same report. She visited with her family and her friend "Sar," who lived nearby, almost every day, for about 30 minutes. Moore had no other social activities. T136, 140. Her conditions made it so she did not want to spend much time with family or friends because she would get stressed and have panic attacks. T136, 139. This also caused her to limit her driving and made it so she did not want to go anywhere. T138. At some time between approximately March and May 2010, Moore and her husband separated, and Moore began to live on her own. T266, 281, 326. She remained in the same home, and her husband moved out. T266.

In May 2010, Moore was examined by psychologist Sheryl Shundoff, Ph.D. Moore's reported symptoms remained more or less the same. T192. She experienced nightmares two to three times a week. T191. Moore reported she had become more anxious since her father had been released from prison, and feared being in public alone. She would not go out in public without her husband or a relative, and she avoided driving alone unless absolutely

---

[3] A GAF score represents "the clinician's judgment of the individual's overall level of functioning," not including impairments due to physical or environmental limitations. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) [hereinafter, "*DSM-IV*"]. The GAF scale is divided into ten ranges of functioning, with a score of 100 representing superior functioning. *Id.* at 32–34. A score in the range of 41 to 50 signifies that the person suffers from "serious" symptoms, such as suicidal ideation, or has "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV* at 34 (emphasis supplied).

necessary. T192. Moore explained that she left jobs after a short time because of her anxiety. She felt that she could deal with her anxiety if she could talk to her aunt or husband on the phone, but she understood that she could not take time at work to call them several times a day. Moore's husband, who was also at the examination, stated that he had difficulty communicating with her and that she was easily angered. T192.

Shundoff observed that Moore's mood was depressed and anxious, and that Moore experienced intrusive thoughts related to her PTSD. T192. Shundoff estimated Moore's IQ to be in the "average to borderline range, by history and observation." T192. Shundoff determined that Moore would likely benefit from medication and therapy, but that Moore would need "longer term intervention due to the depth of her traumatic experience as a youth and teen." T193. Shundoff noted, however, that Moore had financial difficulties that had recently caused her to stop attending therapy. Shundoff diagnosed Moore with PTSD with panic attacks, and major depression, recurrent, mild to moderate. She assessed Moore's GAF for that year as 40–45.[4] T193.

Shundoff also completed a Social Security form assessing Moore's current level of functioning. T194. The form presented a series of "yes" or "no" questions with space for Shundoff to explain. Shundoff identified no restrictions in Moore's activities of daily living, except that she had to take someone with her when shopping or in public. She marked that Moore had difficulty maintaining social functioning, as she avoided contact with people except her immediate family and aunt. Shundoff marked that Moore suffered "recurrent episodes of deterioration when stressed which result in withdrawal from the situation or an exacerbation of symptoms." She explained that Moore would respond with anger and irritability, and could be avoidant and edgy with others. Shundoff stated that Moore was capable of handling her own funds, understanding short and simple instructions, and carrying out such instructions under ordinary supervision. T194. Shundoff answered several questions with "Yes, but . . . ." She noted that Moore had the "ability to sustain concentration and attention needed for task completion," but that she was easily sidetracked or distracted. Moore could "relate appropriately to co-workers and supervisors," but could be irritable and outspoken. And Shundoff found that Moore had the "ability to adapt to changes in [her] environment," although it would not be easy for her. T194.

---

[4] As relevant here, a score in the range of 31 to 40 signifies "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . . ." *DSM-IV* at 34 (emphasis supplied).

From May to July 2010, Moore met with Susan Winchester, APRN, for medication management. Moore continued to report the same symptoms as before. *See, e.g.*, T230–31, 233, 236, 239–40. Moore stated that she had been dealing with these problems for 2 years, but that she was now remembering details of her abuse that she had previously blocked out. T230, 235. Winchester adjusted Moore's medications and diagnosed her with PTSD and "mood disorder not otherwise specified," and stated that bipolar disorder needed to be ruled out. Winchester assigned Moore a GAF score of 40. T230, 233–34. Throughout the period she met with Moore, Winchester continued to rate Moore's GAF as 40, except for once, when it rose to 45. T218–228. From May to June, Moore reported that she was sleeping well and had no insomnia, but reported being irritable and tired throughout the day. Winchester's mental status examinations revealed continued poor attention and focus on Moore's part. Winchester's notes stated that Moore was making adequate progress, but that her prognosis was guarded. T224–228.

Winchester provided an opinion regarding Moore's functioning in a June 15, 2010, case management note. T223. She wrote: "Depression and anxiety interfere with ability to work at this time. Trials on medication so far unsuccessful. Wants to work, but at this time could only work a few days a week for a few hours a day in a very low stress situation." Winchester continued to assess Moore's GAF at 40, but changed her diagnosis to PTSD and bipolar I disorder. T223.

Winchester met with Moore three more times from June 16 to July 7, 2010. Moore reported some insomnia on one occasion, but otherwise continued to report that she was sleeping well. T217–221. Winchester continued to note that Moore was making adequate progress, and changed her prognosis from "guarded" to "good." T217–221. Moore's mood remained generally neutral and her attention and focus poor. T217–221. On June 30, Moore reported improvement in her mood swings. T219. Winchester placed Moore on Strattera (a medication used to treat attention deficit disorder), and by their final meeting on July 7, while Winchester's mental status examination showed that Moore's attention and focus were still poor, they had improved with the Strattera. T217, 220.

Beginning in July 2010, Moore began seeing Sarah Grosse, APRN, for medication management, after being referred by Winchester due to a lack of responsiveness to her medication regime. T281. On July 16, Grosse performed a diagnostic psychiatric evaluation. Moore continued to report the same symptoms, including nightmares, difficulty sleeping, depression, mood swings, panic attacks, and difficulty focusing. Moore stated that the Strattera was still helping with her attention and focus, but kept her awake at night. T281. Moore stated that her greatest challenges at that time were her

nightmares and panic attacks. She explained that she had not suffered from panic attacks until the last year. T281.

Moore stated she had difficulty obtaining and maintaining employment due to her panic attacks, temper issues, poor concentration, and getting angry and just walking away from jobs. T283. Grosse noted that the interview became too long for Moore's attention span, and that Moore had difficulty sitting still and kept asking when they would be finished. Grosse observed that Moore had poor concentration and was clearly having difficulty with the interview process. T284.

Grosse diagnosed Moore with bipolar I disorder, attention deficit disorder, and PTSD, and assigned her a GAF score of 42. T285. Grosse prescribed a variety of new medications, to help with Moore's nightmares, attention deficit disorder, mood stabilization, and for symptoms of anxiety and depression. T285. Treatment notes from August to November 2010 show that Moore and Grosse worked consistently to adjust Moore's medications to help with her conditions and minimize side effects, and that overall, they made some progress. T273–80.

When Grosse and Moore next met in August 2010, Grosse added a diagnosis of mild mental retardation. T279. Grosse observed that Moore's energy and motivation were increased, and Moore denied difficulty sleeping. In September, Grosse observed no improvement in Moore's symptoms, but noted that they had established a rapport. T277. In October, although Moore reported difficulties with some of her medicines and continuing nightmares, as well as continued depression, irritability, and mood swings, Grosse for the first time found that Moore's symptoms had improved. T275–76.

In November 2010, Moore reported that her medications were working "'really well.'" T273. She was no longer having any mood swings, although she felt "'like a zombie.'" T273. She was sleeping excessively but her nightmares were better, and although she was stressed, her mood was "'pretty good.'" T273. Moore stated that her focus had improved with medication but she was still having trouble focusing, and that her energy was down but she did not have to force herself to get out of bed. Grosse observed that Moore's motivation was within normal limits, she was coping well with her anxiety, and that her mood was euthymic. T273. Grosse again found that Moore's symptoms had improved. T274.

In late September 2010, state agency medical consultant Jennifer Bruning Brown, Ph.D., completed forms assessing Moore's mental health issues. T245–65. These forms included a "Mental Residual Functional Capacity Assessment" form. T259. The form contained four broad categories: Understanding and Memory; Sustained Concentration and Persistence; Social Interaction; and Adaptation. Each category included spaces to assess

several specific work-related abilities. For example, within the category "Understanding and Memory," the form asked for an evaluation of Moore's ability to understand and remember both very short and simple instructions and detailed instructions. Each ability was rated using checkboxes corresponding to the following five options: not significantly limited; moderately limited; markedly limited; no evidence of limitation in this category; and not ratable on available evidence. T259–60.

Briefly, Bruning Brown found that Moore was either "not significantly limited" or "moderately limited" in each of the work-related abilities listed on the form. T259–60. She found that Moore's mental conditions did not impose any "marked" limitations. Bruning Brown also attached a brief explanation, and generally concluded that while Moore's conditions imposed some limitations on her ability to work, they would not prevent her from completing a full work day. T261; *see also* T257.

Moore continued seeing Grosse from December 2010 to February 2011. In December, Moore stated that she was not doing too badly and was working on her relationship with her husband. Grosse continued to adjust Moore's medications in response to her input. Moore reported trouble sleeping, and Grosse noted her energy and motivation were variable, that she had moderate overt anxiety, and confirmed that Moore appeared more irritable. T306–07. Grosse concluded that Moore's symptoms had worsened since the last visit. T307.

At her January 2011 visit, Moore stated she was "'not doing too badly'" considering that she could only afford to take one of her medications. T303. She was working on obtaining financial assistance. Moore still reported trouble sleeping and complained that she never felt rested and sometimes took short naps because she was exhausted. She continued to experience mood swings, irritability, and diminished motivation and energy. Moore expressed a general lack of interest in her daily life, and Grosse observed evident anhedonia.[5] T303.

In February 2011, although Moore was still having trouble obtaining all of her medications, she stated that "'I am sure I would do better if I could get all of the medication[s] started . . . .'" T300. While her focus was still improved, some of the medications made it difficult for her to sleep and she reported being tired all day. She denied depression but continued to experience mood swings. Grosse observed that Moore was more focused, that her energy and motivation were within normal limits, and that her overt

---

[5] Anhedonia is a "psychological condition characterized by inability to experience pleasure in normally pleasurable acts." *Merriam-Webster Online Dictionary*, *s.v.* "Anhedonia", available at: http://www.merriam-webster.com/dictionary/anhedonia (last accessed September 27, 2013).

anxiety was mild. Nonetheless, Grosse wrote that Moore's symptoms had remained unimproved. T300.

### III. Hearing Testimony

On May 4, 2011, Moore testified at a hearing before the ALJ. Moore explained that she selected the onset date of December 31, 2009, because around that time she was "just starting to remember" details of abuse by her father that she had previously blocked out. T327. Moore explained that she would wake up "probably several times a night and it was just getting to a point where it was too hard for me to cope with working . . . ." T327. Upon waking, she would experience panic and the sensation that she was being choked. T336. Moore testified that these nightmares were a nightly occurrence, and that in a typical night, she would get 3 hours of sleep in a row. T336, 340. She stated this left her tired and that she would take a 30-minute to 1-hour nap during the day. T332, 336. Moore explained that she was fired from her most recent job because she "couldn't keep up with what they wanted." T328. When asked why she no longer worked, Moore stated, "It's just too much for me. It's too much stress. I get angry easy if something don't [sic] go right. I have panic attacks. I'm really tired a lot." T330.

Moore testified that she experienced panic attacks three times a week. She described these as causing chills and shakes. But Moore also stated that they were "[n]o[t] too bad. Most of it is just stress." These were triggered by "[b]eing around a lot of people" and "e[v]ery once in a while" by driving. T335. Because of these attacks, Moore disliked driving. When she had a panic attack while driving, she would stop her car and call her aunt. T191, 334–35. It generally took Moore about 20 to 30 minutes to calm down after an attack. T337. Usually she could calm herself down by talking to her aunt, and then she would get where she needed to go and hurry home. T336. Moore testified that she experienced a panic attack on the drive to the hearing, and had needed to pull her vehicle over. T347–48.

This also made shopping difficult. She would become fidgety, nervous, and shaky, and have to go to the bathroom to be alone for 20 to 30 minutes to calm down, or call her aunt. T339. Moore tried to get all of her shopping done at once, and tried to limit it to about twice a month. T342. These attacks also affected her family life. The night before the hearing, Moore was at a family barbecue with about 10 people, and she testified she had a panic attack and had to stay outside to get away from everyone for a while. T336. During the hearing, Moore became nervous and fidgety, and took a short break to walk out in the hallway. T337.

Moore also had trouble with mood swings. She would quickly become irritable and "blow up" at people, including coworkers and family. "If

somebody asks me a question or somebody looks at me wrong or something, I get really angry and speak my opinion out loud when I shouldn't." T338. Moore stated that she had been fired for such episodes, although she offered no specific examples. T338.

Moore testified that she also had trouble concentrating and maintaining focus. T340. Moore's attorney asked if, while working, she had to be redirected or put back onto the task she was supposed to be doing. Moore responded that she had experienced this, and that it would typically happen a "couple of times" in a workday. T340. She also testified that even if she was doing the same task for a work shift, she needed to be continually reminded what to do. T341.

Finally, Moore testified as to her activities of daily living. Her testimony was essentially consistent with her previous statements. Moore was married but still separated, and lived by herself with two dogs. She did not like to leave the house and generally tried to stay home. T333, 341. She did not belong to any clubs or groups, did not attend any regular meetings or church services, and had no hobbies. T332–33. However, Moore also testified that she drove two to three times a day. She drove herself to doctor appointments, the grocery store, and to her stepson's house to see her step-grandchildren. T326. Moore testified that she tended to isolate herself and didn't really have "any other social life." T326, 337. Later in the hearing she admitted that she had a friend who lived nearby (who had come with her to the hearing) that she would visit for coffee. T347.

Moore watched her four step-grandchildren about once a week, when they would spend the night with her. T334–35. She also used a computer on a daily basis to communicate with her daughter via e-mail and a social networking site. T334. Moore would watch approximately 30 minutes of television a day and usually listened to the radio. T333. Moore did not watch much television, because she had a hard time staying focused on it. Moore could read, but only at a second or third grade level—she could read a children's book, but would have trouble with a newspaper, and she did not read for pleasure. T283, 327, 333. Moore did her own laundry, housecleaning, and cooking. T333. She had no trouble handling money. T333. But she would occasionally miss meals because she would forget or was too depressed to eat. T339–40.

The ALJ also heard testimony from a vocational expert (VE). T26, 70, 72, 343–44. The VE testified that, given her RFC, Moore could not perform her past work, but there were jobs existing in the national economy that she could perform. T343–44. The VE listed several "unskilled" positions as

examples.[6] T344. In response to questioning by Moore's attorney, the VE testified that no jobs would exist for an individual who could "never" or "rarely" have contact with coworkers or supervisors. T345. Nor would any jobs exist for an individual that needed to take unscheduled breaks for 20 to 30 minutes at least 3 times per week, in order to deal with panic attacks, or who needed to lie down for 30 to 60 minutes each day to rest. T345–46. And the VE stated that an individual who had difficulty concentrating or maintaining focus such that they had to be redirected back to their work twice a day, on an ongoing basis, would have difficulty maintaining employment. T346–47.

### IV. Post-Hearing Evidence

Following the hearing, Moore submitted additional evidence to the Appeals Council. The new evidence consisted of a form filled out by Grosse and dated September 15, 2011. The form was also signed by Eva Brion, M.D. T16. It is not clear what Brion's relationship to Grosse was or whether Brion had ever evaluated Moore, participated in her treatment, or supervised Grosse. Although the form was completed after the ALJ's hearing, it stated that its contents reflected Moore's conditions and limitations from July 2010 onward. T16.

The form was more or less identical to the mental RFC assessment form filled out by Bruning Brown. Unlike the form filled out by Bruning Brown, this form defined "moderately" and "markedly limited." The former was defined as "[t]he impairment prohibits that activity or function 1/3 of the time." The latter was defined as "[t]he impairment causes problems in the ability to perform the named activity to the extent that it precludes it." T14.

Briefly stated, Grosse found that Moore's conditions imposed significantly more severe limitations on her work-related abilities than found by Bruning Brown (and Shundoff). Among other things, Grosse found that Moore was moderately limited in her ability to understand, remember, and carry out very short and simple directions, and markedly limited in her abilities to: maintain attention and concentration for extended periods, make simple work-related decisions, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. T14–15. By comparison, Bruning

---

[6] Social Security regulations distinguish between "unskilled", "semi-skilled", and "skilled" work. *See* 20 C.F.R. § 416.968. Several of Moore's previous positions, such as the retail cashier and waitress, were semiskilled. T177.

Brown had found that Moore had no significant limits in most of these categories, and moderate limitations in only a few others. T259–60.

The form contained several other findings from Grosse. She found that Moore's then-current GAF was 47. T14. Grosse stated that Moore's impairments would cause her to be absent from work about 3 days per month, and that her impairments had lasted or could be expected to last 12 months. She also checked boxes signifying that Moore's impairments were reasonably consistent with the symptoms and functional limitations described in the form, and that Moore was not a malingerer. T16. Finally, Grosse explained why Moore would have difficulty working at a regular job on a sustained basis: "[Moore] experiences episodes of extreme irritability where she snaps [at] others and gets demanding. We have had multiple medication trials and have not established effective treatment. Previous [medication] trials for inattention have also failed." T16.

## STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id.* The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.* The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

## ANALYSIS

Broadly stated, Moore presents three arguments. Moore first argues that the ALJ erred at step three by finding that Moore's conditions did not medically equal the listing for intellectual disability. Second, Moore contends that the ALJ improperly disregarded her consistently low GAF scores, and failed to explain what evidence the ALJ relied upon in determining that

Moore's functioning was higher than suggested by these scores. Finally, Moore argues that the Appeals Council erred by determining that the new evidence she presented (Grosse's September 2011 report) was not "material." And, Moore asserts, when this evidence is considered, the ALJ's conclusion is no longer supported by substantial evidence.

In examining Moore's first and second arguments, the Court first looks only to the evidence that was before the ALJ—in other words, everything but Grosse's new report. Based on that evidence, the Court finds Moore's first two arguments unpersuasive. However, the Court concludes that the Appeals Council did err in finding Moore's new evidence was not material. Therefore, the Court will remand this case to the Commissioner for a proper consideration of this evidence.

### I. Medical Equivalence to Listing 12.05C

Moore first argues that the ALJ erred at step three by finding that Moore's intellectual disability, considered singly or in combination with her other impairments, did not medically equal Listing 12.05C for intellectual disability. Listing 12.05 provides, in relevant part:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> . . . .

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.05C.

A claimant will be found to have met Listing 12.05C only if they have satisfied *both* the diagnostic criteria in the introductory paragraph and any one of the four sets of criteria in paragraphs A through D. § 12.00A; *see also*, *Talavera*, 697 F.3d at 153 (the requirements of the introductory paragraph are mandatory); *Cheatum v. Astrue*, 388 Fed. Appx. 574, 576 (8th Cir. 2010); *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006). So, to meet Listing

12.05C, a claimant must show: (1) deficits in adaptive functioning; (2) evidence of initial manifestation before age 22; (3) a valid verbal, performance or full-scale IQ score between 60 and 70; and (4) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Maresh*, 438 F.3d at 899; *see also Cheatum*, 388 Fed. Appx. at 576.

As the ALJ noted, Moore's only IQ test resulted in a full-scale score of 72, which falls outside the eligible range of scores for Listing 12.05C. T31, 293. Although this test was administered when Moore was 12, a person's IQ is presumed to remain stable over time in the absence of evidence of a change in a claimant's intellectual functioning. *Phillips v. Colvin*, 721 F.3d 623 (8th Cir. 2013). So, it is clear that Moore cannot *meet* Listing 12.05C, and Moore does not argue otherwise.[7]

However, a finding that Moore's impairment does not equal Listing 12.05C does not end the inquiry. The ALJ must also determine if Moore's impairments, taken together, are medically equivalent to the listing, that is, equal in severity and duration to the listing criteria. 20 C.F.R. § 404.1526(a). The Commissioner has issued instructions for determining medical equivalence, found within the Program Operations Manual System ("POMS"). *Phillips*, 721 F.3d at 630. The POMS guidelines do not have legal force, nor are they binding on the Commissioner, but the ALJ should consider them. *Id.*

A specific section of the POMS instructs ALJs how to determine medical equivalence for Listing 12.05C. POMS § DI 24515.056.[8] It provides, in relevant part:

> Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g., 70-75) in the presence of other physical or

---

[7] For the sake of completeness, the Court notes that Moore has, however, satisfied the fourth requirement: she had several mental impairments that imposed additional and significant work-related limitations of function. In finding that Moore's bipolar affective disorder, attention deficit disorder, PTSD, and asthma were severe impairments, the ALJ necessarily found that they imposed significant work-related limitations of function. *See* 20 C.F.R. Part. 404, Subpart. P, Appx. 1 § 12.00A (fourth paragraph); *see also*, *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); *Cook v. Bowen*, 797 F.2d 687, 690–91 (8th Cir. 1986).

[8] SSA, *Evaluation of Specific Issues – Mental Disorders – Determining Medical Equivalence*, available at http://policy.ssa.gov/poms.nsf/lnx/0424515056 (last accessed September 27, 2013).

mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

POMS § DI 24515.056(D)(1)(c).

Moore notes that the ALJ did not explicitly state she had considered the POMS guideline. So, Moore argues, the ALJ actually erred in two regards: first, by failing to consider the POMS guideline, and second, by finding that Moore's conditions did not medically equal Listing 12.05C. The Court concludes that both arguments are without merit. The ALJ stated that she determined that Moore's "mental impairments, considered singly and in combination, do not meet or medically equal" the criteria for Listing 12.05. T29. The fact that the ALJ did not mention the POMS guideline does not mean the ALJ failed to consider it. More importantly, the ALJ determined that Moore did not have the requisite deficits in adaptive functioning to satisfy Listing 12.05C, thus precluding any finding of medical equivalence. *See* T30.

SSA regulations do not define "deficits in adaptive functioning." Courts, however, have interpreted the phrase to mean the "inability to cope with the challenges of ordinary everyday life. If you cannot cope with those challenges, you are not going to be able to hold down a full-time job." *Novy v. Astrue,* 497 F.3d 708, 710 (7th Cir. 2007) (citation omitted); *accord Talavera,* 697 F.3d at 153. Examples include "activities of daily living," such as the abilities to live independently, maintain a residence, shop, cook, and maintain appropriate grooming and hygiene. 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00C(1); *see also*, *Cox v. Astrue,* 495 F.3d 614, 618–19 (8th Cir. 2007); *Chunn v. Barnhart,* 397 F.3d 667, 669, 672 (8th Cir. 2005). Courts also look to claimants' social functioning, their ability to maintain concentration, persistence, or pace, and their work experience. *Cox,* 495 F.3d 614, 618–19.

The ALJ properly considered these factors and found that Moore lacked the deficits in adaptive functioning necessary to *meet* Listing 12.05C. The ALJ acknowledged Moore's early educational difficulties and the fact that she had been diagnosed as mildly mentally retarded, but correctly noted that the listing requires more than a label or diagnosis. T30; *Cox,* 495 F.3d at 618 n.4 (medical and legal standards for mental retardation are not identical); *cf. Maresh,* 438 F.3d at 899 (listing does not require formal diagnosis of mental retardation). And the ALJ determined these factors were outweighed by the following considerations: Moore was able to live independently, perform all her activities of daily living without assistance, drive, cook, and clean, and

- 16 -

take care of her four step-grandchildren once a week. The ALJ found no evidence that Moore required assistance in meeting social norms or functioning in society. Finally, the ALJ noted that Moore had previously worked at the level of substantial gainful activity in several positions classified as "semi-skilled" under the Dictionary of Titles (DOT). T30.

Considering the initial evidence before the ALJ, the Court finds that substantial evidence supported the ALJ's determination that Moore did not possess the requisite deficits in adaptive functioning to meet Listing 12.05C. *Compare*, *Hancock v. Astrue*, 667 F.3d 470, 475–76 (4th Cir. 2012) (listing not met where claimant worked several jobs, shopped and paid bills, took care of three small grandchildren, and was attending school to obtain GED); *Novy*, 497 F.3d at 710 (claimant lived independently, took care of three children without help, and paid her own bills); *Cox*, 495 F.3d at 618–19; *with*, *Christner v. Astrue*, 498 F.3d 790, (8th Cir. 2007) (remanding for ALJ to consider whether claimant met Listing 12.05 where he dropped out of school in sixth or eighth grade, attended special education classes, was unable to read or write, and did not live independently); *Chunn*, 397 F.3d at 669.

The ALJ did not explain why she also found that Moore's other mental impairments, considered together with her intellectual disability, did not *equal* Listing 12.05C. But as long as the overall conclusion is supported by the record, there is no prejudicial error when an ALJ fails to explain why an impairment does not equal a listed impairment. *Boettcher*, 652 F.3d at 863. And the Court finds that, even considering Moore's other impairments, substantial evidence supported the ALJ's conclusion that Moore did not possess the requisite deficits in adaptive functioning.

Moore points to evidence showing that she had difficulty maintaining concentration and focus, as a result not only of her intellectual disability but also her attention deficit disorder, depression, and anxiety. For example, in March 2010, APRN Leonard noted that Moore's attention span and concentration were "severely impaired." T182. But Grosse's notes show that by early 2011, Moore's attention had improved with medication. T300, 306. And Shundoff—whose opinion, as the Court discusses below, the ALJ afforded considerable weight—concluded that although Moore was easily sidetracked, she had the ability to sustain the concentration and attention needed for task completion, and could carry out simple instructions under ordinary supervision. T194.

Certainly, Moore's other impairments had some effect on her ability to cope with the challenges of everyday life. This is borne out by Moore's statements, at the hearing, and in her reports to multiple treatment providers over nearly 2 years. Moore claimed that her frequent nightmares and depression left her exhausted. And her mood swings and panic attacks

- 17 -

made it difficult not only for her to work her previous jobs, but even to socialize with her family and to go driving or shopping. But, as the Court will discuss further in connection with Moore's next argument, the ALJ found that Moore's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. T32. Moore has not challenged this finding, and the ALJ's credibility determination was supported by proper reasoning and substantial evidence. So, the Court defers to the ALJ's credibility determination. *See Gonzales,* 465 F.3d at 895–96. Thus, Moore's other self-reported symptoms and limitations—such as her irritability, mood swings, and panic attacks—likewise fail to establish medical equivalence.

The ALJ also noted that despite her emotional problems and difficulty with social functioning, Moore was able to maintain a rapport with Grosse over many months, to care for four step-grandchildren, and to maintain a friendship. T30, 34. And Moore was able to reach out to her husband and aunt for help with her panic attacks. *Charette v. Astrue,* 508 Fed. Appx. 551, 554 (7th Cir. 2013) (ability to reach out for help undermines claim of adaptive deficits). Finally, although Moore's full-scale IQ score of 72 was within the range of IQ scores contemplated by POMS § DI 24515.056, the ALJ noted that this score came with a caveat. T30. The evaluator noted that Moore tended to give up easily and may have been more capable than she appeared. T294. And as the POMS guideline also provides, generally, the higher the IQ, the less likely it is that medical equivalence will be found. POMS § DI 24515.056(D)(1)(c). In sum, the Court finds that substantial evidence supports the ALJ's finding that the totality of Moore's conditions did not equal Listing 12.05C.

Moore also argues that the ALJ erred by improvising her own definition for "deficits in adaptive functioning," rather than applying one of the standards recognized by one of the four major professional organizations dealing with intellectual disability. *See Barnes v. Barnhart,* 116 Fed. Appx. 934, 942 (10th Cir. 2004). Specifically, Moore argues that the ALJ should have used the criteria set forth in the *DSM-IV,* which requires significant limitations in adaptive functioning in at least two of several skill areas, such as communication, self-care, self-direction, work, education, or safety. *DSM-IV* at 41–43.

As noted above, Social Security regulations do not define "deficits in adaptive functioning." Moore's argument derives from comments made by the Commissioner that accompanied a 2002 revision to the Listing of Impairments. *Technical Revisions to Medical Criteria for Determinations of Disability,* 67 Fed. Reg. 20,018 (April 24, 2002). At that time, the Commissioner rejected a proposal that the *DSM-IV*'s diagnostic criteria for

- 18 -

intellectual disability be used for Listing 12.05. 67 Fed. Reg. at 20,022. The Commissioner noted that the definition for intellectual disability used in the listings was "consistent with, if not identical to, the definitions . . . used by the leading professional organizations. The four major professional organizations in the United States that deal with MR [mental retardation] have each established their own definition of [mental retardation]." *Id.* However, unlike those organizations, the SSA's definition is used not for diagnostic purposes, but to determine eligibility for disability benefits. *Id.* So, Listing 12.05 "establishes the necessary elements, while *allowing* use of any of the measurements methods recognized and endorsed by the professional organizations." *Id.* (emphasis supplied).

Moore relies on *Barnes v. Barnhart*, in which the Tenth Circuit expressed concern regarding the lack of a precise definition of "deficits in adaptive functioning," and regarding what it saw as the ALJ's decision to "improvise" his own definition. 116 Fed. Appx. at 936, 942. So, the court remanded with directions that the ALJ choose and apply "a standard consistent with the Commissioner's directive," such as that found in the *DSM-IV. Id.* at 942.

However, other courts, including the Eighth Circuit, have not required the use of criteria endorsed by outside organizations. Instead, as noted above, courts have interpreted "deficits in adaptive functioning" to refer to a claimant's inability to cope with the challenges of everyday life. *See*, *Talavera*, 697 F.3d at 153; *Novy*, 497 F.3d at 710; *see also Charette*, 508 Fed. Appx. at 553 (rejecting argument identical to Moore's). And while the Eighth Circuit has not explicitly adopted this definition, it has consistently applied it—rather than a specific set of diagnostic criteria—in cases addressing Listing 12.05. *See, e.g.*, *Cheatum*, 388 Fed. Appx. at 576–77; *Cox*, 495 F.3d at 618–19; *Chunn*, 397 F.3d at 669, 672; *see also Maresh*, 438 F.3d at 899 (rejecting attempt by Commissioner to use *DSM-IV* criteria to show that claimant did not meet Listing 12.05); *cf. Cox*, 495 F.3d at 618 n.4 (the medical and legal standards for intellectual disability are not identical).

In sum, because the ALJ examined Moore's ability to cope with the challenges of everyday life, she applied the correct legal standard. And reviewing the record under that standard, the Court finds that substantial evidence supported the ALJ's determination that Moore did not meet or medically equal Listing 12.05C.

## II. Moore's GAF Scores

Moore next argues that the ALJ erred in "disregarding" her consistently low GAF scores, and in failing to explain what evidence the ALJ relied upon in determining that Moore's functioning was higher than

suggested by these scores. The Court finds no error in the ALJ's methodology, explanation, or conclusion.

First, the ALJ did not disregard or ignore Moore's GAF scores. The ALJ explicitly stated that she had considered the fact that Moore had received multiple GAF scores below 50. T35. But the ALJ reasoned that such scores were primarily a clinical tool for use by mental health professionals, and did not correspond directly to the criteria used to establish disability. T35. So, the ALJ stated that she had relied instead upon the narrative reports containing the actual opinions of the various treatment providers and other sources, as these were "more applicable to a function-by-function assessment of the claimant's functional capabilities." T35. This statement immediately followed a discussion of the relevant opinions, contradicting Moore's claim that the ALJ failed to cite to specific evidence in support of her decision.

The ALJ acted reasonably in relying on the record as a whole and in affording greater weight to the actual opinions of the various sources in the record. A GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010). While GAF scores may be helpful in assessing disability, they are not essential to determining an individual's RFC. *Id.* The *DSM-IV* itself makes clear that a given score may have little bearing on the subject's occupational functioning. *Id.* That is because a GAF score measures both a person's symptom severity and their functioning, and always reflects the worse of the two. *DSM-IV* at 32–33. So, "the GAF rating for an individual who is a significant danger to self but is otherwise functioning well would be below 20." *Id.* at 33. The difference between a GAF score and an assessment of a claimant's ability to work is illustrated by Shundoff's report, which the ALJ afforded considerable weight. T35. Shundoff assigned Moore a GAF score of 40–45, which, considered alone, could suggest major or serious impairments in functioning that would prevent Moore from working.[9] Yet Shundoff opined that Moore was more or less capable of performing the basic mental tasks associated with working, albeit with some difficulty. T193–94.

The Commissioner has explicitly recognized that GAF scores have no direct correlation to the severity requirements of the SSA's mental disorders listings. *Jones*, 619 F.3d at 973–74; *see also Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000). Thus, the ALJ may afford greater weight to other medical evidence and testimony than to GAF scores when the evidence

---

[9] As noted above, GAF scores in the ranges of 31 to 40 and 40 to 50 suggest the possibility of "major" and "serious" impairments in social and occupational functioning, respectively, and are consistent with an inability to keep a job. *See DSM-IV* at 34.

- 20 -

requires it. *Jones*, 619 F.3d at 974; *see also Goff v. Barnhart,* 421 F.3d 785, 791 (8th Cir. 2005). Here, the ALJ correctly reasoned that the specific findings of Shundoff and other sources were more relevant to the ultimate issue under consideration—not the severity of Moore's symptoms, but the effect of those symptoms on her ability to work. In short, the ALJ was not required to assign any particular weight to Moore's GAF scores, and did not err in finding other evidence to be more probative.

More broadly, the Court understands Moore to be arguing that the RFC assessment was not supported by substantial evidence, in that it did not reflect the serious or major impairment in Moore's ability to work suggested by her GAF scores. Again, the Court finds no error in this regard. Instead, the Court concludes that, based on the evidence available at the hearing, the RFC assessment was supported by substantial evidence.

The ALJ relied primarily upon the reports of Shundoff and Bruning Brown. T35. As discussed above, Shundoff generally concluded that while Moore's conditions caused her difficulty, she could still work. T194. Bruning Brown's findings were similar. Bruning Brown found that Moore had either no significant limits, or only moderate limits, in her "basic mental work activities," T33, such as the ability to understand and remember very short and simple instructions; to work in coordination or proximity to others without being distracted by them; and to get along with coworkers without distracting them or exhibiting behavioral extremes. T259–60. Bruning Brown explained that while Moore would have some limitations on her ability to work, they would not prevent Moore from completing a full work day. T261. The Court finds that these opinions provided substantial evidence for the RFC assessment.

There were two other principal sources of evidence that related to Moore's ability to work and suggested greater limitations: (1) an opinion from Winchester in June 2010; and (2) Moore's self-reported limitations, as expressed at the hearing, in disability reports, and to various treatment providers. The ALJ considered both and determined that Winchester's opinion should be afforded little weight and that Moore's statements were not entirely credible. T31–36. Moore has not argued that the ALJ erred in either of these determinations, and on the evidence before the ALJ, the Court sees no error in either decision.[10]

In June 2010, Winchester wrote in a brief report that Moore's depression and anxiety "interfered with [her] ability to work at this time" and concluded that Moore could only work a few days a week, for a few hours a

---

[10] The Court finds it appropriate to review these determinations even in the absence of any objection by Moore. If nothing else, this review is helpful to the Court's analysis of the effect of Moore's new evidence. *See* part III, *infra*.

day, in a "very low stress situation." T223. The ALJ stated that she carefully considered Winchester's opinion but decided to give it little weight. First, the ALJ noted that Winchester's opinion was inconsistent with Shundoff's. T35. As a psychologist, Shundoff was an "acceptable medical source." Social Security regulations distinguish between "acceptable medical sources" and "other sources." The latter include both medical and non-medical sources. *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007); 20 C.F.R. § 404.1502. Acceptable medical sources include, among other things, licensed physicians and licensed or certified psychologists. *Sloan*, 499 F.3d at 888; § 404.1513(a). "Other" medical sources include, *inter alia*, physician assistants and nurse practitioners, such as Winchester. *Sloan*, 499 F.3d at 888; § 404.1513(d). Shundoff's status as an acceptable medical source was a factor that the ALJ was entitled to consider in affording her opinion greater weight. SSR 06–3p, 71 Fed. Reg. 45,593, 45,596 (Aug. 9, 2006).

The ALJ also reasoned that Winchester's opinion was undermined by subsequent progress notes showing that Moore's condition improved in response to medication. T35. This reasoning finds support in the record. Shortly after Winchester issued her opinion, she changed Moore's prognosis from "guarded" to "good." T217–21. And by the next month, Moore reported that while her attention and focus were still poor, they had improved with medication, and that she had also seen improvement in her mood swings. T217, 219, 220.

It is true that Moore's improvement was modest at first. Winchester referred Moore to Grosse in July 2010 because of a lack of responsiveness to Winchester's medication regime. T281. And when Grosse first met Moore and performed a diagnostic evaluation, Moore's difficulty focusing was readily apparent. Grosse noted that the interview became too long for Moore's attention span and that she had difficulty sitting still. T283–84. This was despite the fact that Moore claimed the Strattera was still helping with her attention and focus. T281.

But Moore continued to improve with treatment. By November 2010, Moore reported that her medications were working "'really well,'" that her mood swings and nightmares had improved, and that although she was stressed her mood was "'pretty good.'" T273. Moore still reported trouble focusing but stated that her attention had improved in response to new medication. T273. Grosse agreed that Moore's symptoms had improved, and noted that her motivation was within normal limits and that she was coping well with her anxiety. T273.

From December 2010 to February 2011 there was some worsening of Moore's symptoms. T300–307. But Grosse noted that Moore was having difficulty affording her medications at that time. Despite this, Moore reported

she was "not doing too badly,'" denied depression, claimed her focus was still improved, and while some of her medications caused her difficulty sleeping, she did not report any nightmares. T300–307. And by February, Grosse observed that Moore's focus was improved, that her energy and motivation were within normal limits, and that she had only mild overt anxiety. T300. Finally, by the time of the hearing in May 2011, Moore had obtained financial assistance for her medications and was taking them as prescribed. T331–32.

In short, there is substantial evidence in the record to support the ALJ's finding that from the time of Winchester's opinion in June 2010, Moore's condition continued to improve. This provided the ALJ with a proper basis to afford greater weight to Shundoff's opinion. It is the ALJ's role to resolve conflicts among the opinions of various experts, *Renstrom v. Astrue,* 680 F.3d 1057, 1065 (8th Cir. 2012), and substantial evidence supported the ALJ's decision to afford Shundoff's opinion greater weight.

The Court likewise finds that, on the record before the ALJ, substantial evidence supported the determination that Moore's statements regarding her symptoms were not entirely credible. T32. The credibility of a claimant's subjective testimony is primarily for the ALJ to decide. *Vossen v. Astrue,* 612 F.3d 1011, 1017 (8th Cir. 2010). The ALJ's credibility determination must be upheld if the ALJ provides good reasons for discounting the claimant's subjective complaints—such as inconsistencies in the record or the factors set forth in *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)—and those reasons are supported by substantial evidence. *Gonzales,* 465 F.3d at 895–96. Here, the ALJ considered the appropriate factors and provided several legitimate reasons for her credibility assessment.

First, the ALJ found that "[a]lthough the claimant's steady work history bolsters some of the credibility of her complaints, her past relevant work at the semi-skilled level negates the credibility of her allegations of limitations from being mildly mentally retarded." T33. Second, while Moore's anxiety and mood swings imposed some limits on her social functioning, the ALJ found that the record did not support Moore's "testimony of paranoia and agoraphobia." T34. In other words, the ALJ found Moore's statements regarding her panic attacks—which she claimed could be triggered by driving, being around a lot of people, and being at work—to be not entirely credible.

The ALJ likewise determined that Moore's irritability and mood swings would not interfere with Moore's social functioning to the extent that it would entirely preclude her from working. The ALJ pointed to the fact that Moore was able to maintain a rapport with her medical providers (and in particular, Grosse) and relate well to Shundoff during their meeting. T34; *see* 191, 277. Finally, the ALJ discounted Moore's claims regarding her inability to

concentrate and focus. T34–35. The ALJ again noted that Moore's abilities in this area improved with medication. T32–34. And the ALJ found it significant that Moore was able to maintain attention sufficiently to watch her four step-grandchildren once a week, use a computer to communicate with her daughter, and shop without assistance. T34.

It is important to note, however, that the ALJ apparently found Moore's subjective complaints to be credible in many respects. This is reflected in the ALJ's assessment of Moore's RFC. The ALJ limited Moore to simple, routine, and repetitive tasks in a low stress environment, defined as requiring only occasional decision-making and occasional changes in the work setting. Additionally, Moore was limited to work involving no interaction with the public and no more than occasional contact with coworkers. T31. These limitations show that the ALJ carefully considered and accounted for the effects of Moore's anxiety, mood swings, intellectual disability, and difficulty concentrating, and the threat that stressful situations would exacerbate her conditions. On the other hand, the ALJ did not believe that Moore would need to take a nap every day during work, or that Moore's irritability would make her impossible to work with, or that Moore's panic attacks would occur with such severity and regularity as to preclude employment.

In sum, the Court finds that the ALJ properly weighed the evidence and assessed Moore's credibility. The ALJ did not have the opportunity to review Grosse's new report, which as the Court explains next, may have affected the ALJ's assessment of Moore's credibility and resulted in a different RFC and a different outcome. However, based on the initial evidence that was available, the RFC determination was supported by substantial evidence.

### III. Moore's Post-Hearing Evidence

Finally, Moore argues that the Appeals Council erred in determining that the new evidence she presented (Grosse's September 2011 report) was not material. And, Moore asserts, when this evidence is considered, the ALJ's conclusion is no longer supported by substantial evidence, and this case should be reversed and remanded for further consideration. The Court finds that the Appeals Council did err in this determination, and that a remand is warranted. But rather than determine whether the ALJ's opinion is still supported by substantial evidence, the Court finds that the ALJ should decide, in the first instance, what weight to give Grosse's opinion.

SSA regulations provide that

> [i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.

20 C.F.R. § 404.970(b). Thus, if a claimant files additional medical evidence with a request for review prior to the date of the Commissioner's final decision, the Appeals Council *must* consider the additional evidence if the additional evidence is new and material. *Whitney v. Astrue*, 668 F.3d 1004, 1006 (8th Cir. 2012).

To be "new," evidence must be more than merely cumulative of other evidence in the record. *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008). And evidence is "material" if it is relevant to the claimant's condition for the time period for which benefits were denied. *Id.* To be material, there must also be a reasonable likelihood that consideration of the evidence would have changed the Commissioner's determination. *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011); *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003) (same); *see also Padgett v. Shalala*, 9 F.3d 114, at *2 (8th Cir. 1993) (unpublished table decision); *cf. Krogmeier v. Barnhart*, 294 F.3d 1019, 1025. (8th Cir. 2002) (applying same standard to new evidence received for first time by court under 42 U.S.C. § 405(g)). Whether evidence meets these criteria is a question of law the Court reviews de novo. *Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th Cir. 2000).

Here, the Appeals Council stated that it had examined Grosse's report, but determined that the ALJ "decided your case through May 25, 2011. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before May 25, 2011." T8. In other words, the Appeals Council found that the new evidence was not material.

This finding was incorrect; Moore's evidence was both new and material. Grosse's report was new, as it was not merely cumulative of other evidence in the record. Other than Winchester, no person who had treated Moore had provided any opinion as to her ability to work. Grosse's report was also much more detailed than Winchester's, and provided a longitudinal picture of Moore's functioning over a significantly longer time frame. The new evidence also satisfied the first materiality prong, as it related to Moore's mental conditions that were the subject of her disability claim, and it concerned the effect of those conditions during the relevant time period. That

the report was written following the ALJ's decision is not dispositive of whether it is material. *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990). Medical evidence obtained after the ALJ's decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision. *Id.* The report clearly states that it concerns Moore's condition from July 2010 onward. T16.

The report also satisfies the second materiality prong. There is a reasonable possibility that, were the ALJ to have considered Grosse's opinion, she may have found Moore disabled. When Grosse's report is considered, Winchester no longer stands alone in opining that Moore had greater limitations than found by the other sources. The ALJ also gave Winchester's opinion little weight because of the improvement reflected in the notes of Winchester and Grosse. But Grosse's report potentially casts doubt on the extent or sustainability of any improvement. The new evidence may also have affected the ALJ's determination of Moore's credibility. As discussed above, the ALJ found that Moore's claimed limitations were at least partially supported by the record, and therefore the ALJ must have found Moore somewhat credible. Grosse's report provides further support for Moore's claims, and could bolster her credibility such that the ALJ would have found additional limitations warranted.[11] In short, "the picture presented to the ALJ is significantly altered by the additional evidence." *Bergmann*, 207 F.3d at 1070.

The Eight Circuit has stated that where the Appeals Council fails to consider new and material evidence, it may be a basis for remand by a reviewing court. *Whitney*, 668 F.3d at 1006. The Court finds that a remand is appropriate in this case. The Appeal Council's conclusion that the report did not relate to the relevant time period—which is contradicted by an examination of the report—demonstrates that the Council failed to consider the substance of the evidence. *See Box v. Shalala*, 52 F.3d 168, 172 (8th Cir. 1995). This Court would therefore be placed in the position of being the first to make factual findings regarding Grosse's opinion and whether it can be reconciled with the other evidence in the record. *Meyer*, 662 F.3d at 707. But

---

[11] It is true that Grosse, like Winchester, was an APRN and thus not an acceptable medical source. However, opinions from "other" sources such as Grosse are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06–3p, 71 Fed. Reg. at 45,595. And in some cases, after weighing the appropriate factors, an opinion from a non-acceptable medical source may be entitled to even more weight than the opinion of a treating physician. *Id.* at 45,596. Grosse saw Moore many more times and over a greater period than any other source in the record. And while her report consists only of a checklist form and a brief explanation, the same is true of the opinion of Bruning Brown, who never met Moore, and whose opinion the ALJ gave significant weight. T35.

"[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder[,]" and it is not appropriate for this Court to usurp that role. *Id.*; *see also Williams*, 905 F.2d at 217 (factual determinations within the agency's expertise are best left to the Commissioner).[12]

The Court therefore finds that this case should be remanded to the Commissioner.[13] If the Commissioner decides that an award of benefits is not appropriate, the case should be remanded to the ALJ for further proceedings. *See Lamp*, 531 F.3d at 633 (court may remand directly to ALJ for consideration of evidence that Appeals Council failed to consider). In that event, the ALJ should consider the effect, if any, of the new evidence on the ALJ's previous findings regarding Moore's credibility, the weight to afford to the opinions of the various sources in the record, and ultimately, Moore's RFC. The ALJ should also consider whether this report affects the determination that Moore has failed to demonstrate the requisite deficits in adaptive functioning necessary to medically equal Listing 12.05C.

## CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ did not err in any of the ways asserted by Moore. The Court also finds, however, that the Appeals Council erred in failing to properly and fully consider the new and material evidence submitted by Moore. Accordingly,

IT IS ORDERED:

1.    This case is reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

2.    A separate judgment will be entered.

---

[12] The Court therefore rejects the invitation by both parties to analyze the new evidence under the standard of review typically used when the Appeals Council *properly* considers evidence and declines review. Filing 22 at 27–29; filing 28 at 19–20. In such a case, the Court would determine whether the record as a whole, including the new evidence, provided substantial evidence in support of the ALJ's determination. *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000). In this case, however, the question is not whether the ALJ's opinion would still be supported by substantial evidence if Grosse's opinion is considered, but whether there is a reasonable possibility the ALJ's opinion would have been materially different, had Grosse's opinion been available.

[13] The remand will be pursuant to sentence four of § 405(g). *Boyd v. Astrue*, 2009 WL 856699, at *4 (E.D. Ark. 2009); *see also Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000).

- 27 -

Dated this 30th day of September, 2013.

BY THE COURT:

John M. Gerrard
United States District Judge